USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/25/10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

MARK AGUIAR,

                                          06 Civ. 03334 (THK)

                          Plaintiff,

         -against-

                                **MEMORANDUM OPINION AND**
                                     **ORDER**

State of New York;
New York State Unified Court System;
New York State Supreme Court,

                          Defendants.

----------------------------------------X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff Mark Aguiar, who is a principal appellate attorney for the Appellate Term of the New York State Supreme Court Appellate Division, First Department, brought this action under federal, state, and local employment discrimination statutes, claiming that he was denied a promotion to the position of Chief Court Attorney in retaliation for his opposition to alleged discriminatory employment practices in the Appellate Division, and because of his sexual orientation. Following Defendants' motions for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), all of Plaintiff's claims were dismissed except for his claim of retaliation under Title VII of the Civil Rights Act of 1964, as amended ("Title VII).

After the commencement of pretrial discovery, but before Plaintiff had been deposed, the parties commenced settlement discussions under the Court's supervision. On April 7, 2008, after

an approximately four-hour negotiation session, an agreement was reached to settle the action, and the terms of the agreement were placed on the record, in open court. Subsequently, as the parties attempted to memorialize their agreement in writing, disagreements arose over several provisions of the agreement, and Plaintiff asked the Court to reinstate the matter to the "active calendar." At a further conference, held on June 17, 2008, the Court attempted to assist the parties in resolving their differences, but, ultimately, Plaintiff took the position that there is no binding settlement agreement and requested that the case proceed to trial. Defendants then filed the instant motion to enforce the settlement agreement that was placed on the record on April 7th.[1]

For the reasons that follow, the Court concludes that the parties intended to be bound by their oral, on-the-record settlement agreement and, therefore, grants Defendants' motion to enforce the agreement.

## BACKGROUND

At the conclusion of a settlement conference held on April 7, 2008, the parties reached agreement on the material terms of a settlement. They then gathered in the courtroom and, with their consent, the Court stated, on the record, that the "parties have reached an agreement . . . on terms to settle the case with the

---

[1] The parties have consented to proceed before this Court for all purposes, including trial, pursuant to 28 U.S.C. § 636(c).

understanding that the agreement will be subsequently embodied in a writing that will be circulated and signed." (Transcript of April 7, 2008 Settlement Conference ("Tr."), at 3.) The Court then asked Plaintiff's counsel to outline the terms of the agreement, which were stated as follows:

(1) "there will be a waiver and release executed by all the parties";

(2) "the court [defendants] will implement an employee evaluation program";

(3) "the agreement will include a no-retaliation clause";

(4) "the agreement will include a liaison clause involving Justice Mazzarelli, and the general outline of that clause has been drafted previously by counsel for the court defendants";

(5) "there's to be a non-admissions clause";

(6) "that there be a non-publication clause whereby neither party would publicize the terms of the settlement agreement, and if asked what the terms of the settlement agreement [are] or how it was resolved, the response will be it was resolved and the settlement agreement is part of the public record." There would be a "carve-out" for Plaintiff's friends;

(7) "the deposition transcript of Susanna Rojas and all discovery documents exchanged between the parties will remain confidential" (there was a previous stipulation that personnel records that were produced in discovery would be returned to

3

Defendants);

(8) "so long as the court defendants determined in the last reorganization that those court attorneys from the appellate term were allowed to keep their offices, notwithstanding the transfer to the Supreme Court law department, likewise should Mr. Aguiar be transferred within the building he will retain his office, Room 400-A";

(9) "there'll be a side letter in which counsel for the court defendants will state that . . . the court defendants have no present intention to transfer, or terminate, or discipline, or move for operational reasons Mr. Aguiar, that he's considered a satisfactory employee, and that nothing in the Rojas deposition can be construed as notice of job deficiency or the basis to take adverse action";

(10) "a side letter, whether a separate side letter or the same side letter, will be prepared by counsel for the court defendants stating that the court defendants will take into account seniority in any operational decision-making regarding Mr. Aguiar's employment";

(11) "in the event of a proposed adverse employment action affecting Mr. Aguiar, the court defendants will provide advance notice of the proposed action, except this provision does not prohibit the court defendants from taking appropriate action in the event of gross misconduct";

4

(12) "the court defendants agree not to take disciplinary action against Mr. Aguiar for work deficiency unless [they have] provided him advance notice of the alleged deficiency and an opportunity to improve his performance";

(13) "the parties will enter a consent decree which will be signed by the Court, and the parties will execute the proper documents so that the matter will be transferred from Judge Rakoff to Judge Katz, and Judge Katz will be the signator of the consent decree. The consent decree will be the exclusive forum for any legal action by Mr. Aguiar regarding the alleged retaliation - any alleged retaliation . . . . The length of the consent decree is two years from the effective date of the agreement";

(14) "Plaintiff agrees to take action to enforce the consent decree only if he has a good faith belief that he was subject to unlawful retaliation";

(15) "[P]laintiff may have an introductory meeting with Justice Mazzarelli, who has agreed to be the liaison person regarding this matter";

(16) "[a] procedural defect on the part of the court defendants regarding the terms of the settlement agreement is not a basis to pursue enforcement action. That will be set forth in a side letter that I will execute."

(Tr. 3-8.)

After the agreement was placed on the record, the following

5

colloquy occurred:

> Court: Does that accurately reflect the state and court defendants' understanding?
>
> Mr. Falk: Yes, Your Honor, it does.
>
> Mr. Martin: It does, Your Honor.
>
> Court: And are the state and court defendants prepared to settle the case on those terms?
>
> Mr. Falk: Yes, we are, Your Honor.
>
> Mr. Martin: Yes, we are.
>
> Court: Thank you. Mr. Aguiar, you've had a chance to discuss these terms with Mr. Beranbaum?
>
> Mr. Aguiar: Yes, Your Honor.
>
> Court: Okay, and you understand what they are?
>
> Mr. Aguiar: Yes, I do.
>
> Court: Are . . . you prepared to settle the case based on those terms?
>
> Mr. Aguiar: Yes, Your Honor.
>
> Court: Great. I'm really glad that we can finally get some closure here. I actually have a form so that you can execute the consent, and I think that what we should do is strive to have, you know . . . get this submitted to me, say, within ten days so that we can get this officially entered. . . .
>
> Court: I'm glad that we were able to resolve it. Mr. Aguiar, good luck in the future. I hope things go well for you.
>
> Mr. Aguiar: Thank you.
>
> Court: And I look forward to seeing the document. Thanks for coming in. I appreciate the state's cooperation.

(Tr. 8-10.)

Subsequently, the parties attempted to draft a document that

6

reflected the agreement that had been reached. Each contends that the other sought to incorporate new terms into the proposed consent decree. Plaintiff contends that "defendants interpreted the April 7 agreement's generic, non-specific terms so as to give them additional substantive rights; they sought to reconcile inherently conflicting terms; and they undercut the protections given Aguiar in the April 7 agreement." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Enforce Settlement Agreement ("Pl.'s Mem.") at 6.) For example, in their draft of the "advance notice" provision, Defendants stated:

Where possible, the Court Defendants shall endeavor to provide plaintiff with advance notice of proposed materially adverse employment actions, except that when such action affects other employees along with plaintiff, the Court Defendants shall not be required to give plaintiff such advance notice as would afford plaintiff an advantage over such employees, as a matter of fairness.

(See Defendants' Draft Agreement (Defs.' Draft"), Exhibit ("Ex.") 7 to Affirmation of John A. Beranbaum, dated July 25, 2008 ("Beranbaum Aff."), ¶ 12 (a).) In contrast, Plaintiff injected into the advance notice provision a requirement that he be given "written notice 60 days in advance" of any intended adverse employment action, including actions that are the result of operational changes, such as a restructuring, reorganization, or reduction-in-force. (Id.)

Plaintiff further argues that "[t]he April 7 agreement relied, in large part, on generic, non-specific terms, such as 'advance

7

notice'; 'non-admission clause'; 'a no-retaliation clause'; 'waiver and release'; 'non-publication clause'; and 'procedural defect,' [and] Defendants, in their draft agreement, interpreted these open-ended terms in a self-serving way that granted themselves rights not articulated in the oral agreement." (Pl.'s Mem., at 7 (citations omitted).) Thus, Plaintiff contends, for example, that Defendants expanded the non-admissions provision to state that neither party was a prevailing party for any purpose, that the agreement has no precedential value, and the agreement does not represent a policy or practice of Defendants. Plaintiff further complains that Defendants expanded the "non-publication" provision by allowing communications between counsel and "court officials of unknown identity, rank or number." (Pl.'s Mem., at 8.)

Plaintiff also argues that the April 7th agreement contains contradictory provisions about what remedies remain to Plaintiff for challenging alleged unlawful retaliation. The agreement, which incorporated by reference a draft Liaison Agreement that had been negotiated (see Beranbaum Aff., Ex. 5), gives Plaintiff the right, in the first instance, to raise with Justice Mazzarelli his concerns about any alleged retaliation for bringing the instant action. If Plaintiff is dissatisfied with the resolution of any matter brought before Justice Mazzarelli, he is free to utilize "whatever other remedies may be available to him pursuant to law, rule, statute, or collective bargaining agreement." (Id. ¶ 4.)

8

Plaintiff argues that this provision is at odds with paragraph 13 of the April 7th agreement, which provides that "the consent decree will be the exclusive forum for any legal action by Mr. Aguiar regarding the alleged retaliation -- any alleged retaliation." (Tr. at 7.)

Plaintiff and Defendants each made other additions to the April 7th agreement. Ultimately, the parties were unable to reconcile their divergent draft agreements, and Plaintiff requested that the matter be reinstated to the active calendar.

Defendants now argue that the Court should enforce the April 7th oral agreement, while Plaintiff argues that the parties did not agree to be bound until they agreed upon and executed a written stipulation of settlement.

## DISCUSSION

It is axiomatic that "[a] settlement agreement is a contract that is interpreted according to general principles of contract law. Once entered into, the contract is binding and conclusive. When a party makes a deliberate, strategic choice to settle, a court cannot relieve him of that choice simply because his assessment of the consequences was incorrect." Powell v. Omnicom, BBDO/PHD, 497 F.3d 124, 128 (2d Cir. 2007) (internal citations omitted). As another court has observed:

A settlement stated on the record is one of the strongest and most binding agreements in the field of the law and is thus entitled to substantial deference. A court should be extremely hesitant to pry into the thoughts and

9

motives of the parties after the fact in an attempt to discern their intent in settling a case.

Medinol Ltd. v. Guidant Corp., 500 F. Supp. 2d 345, 353 (S.D.N.Y. 2007) (internal citations and quotations omitted).

The parties rely primarily on federal law in addressing whether there is a binding settlement agreement. The Court need not decide whether that reliance is well-founded, as there is no material difference between New York and federal common law when it comes to determining whether parties intended an oral settlement agreement to be binding. See Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 322 (2d Cir. 1997).

> Under New York law, parties are free to bind themselves orally, and the fact that they contemplate later memorializing their agreement in an executed document will not prevent them from being bound by the oral agreement. However, if the parties intend not to be bound until the agreement is set forth in writing and signed, they will not be bound until then. The intention of the parties on this issue is a question of fact, to be determined by examination of the totality of the circumstances.

Id. (internal citations omitted); accord Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1985); see also Silas v. City of New York, 536 F. Supp. 2d 353, 355 (S.D.N.Y. 2008) ("Under C.P.L.R. 2104 there are three ways to create a valid and binding stipulation of settlement. Two of those procedures require a writing . . . . In the absence of a writing, however, an oral stipulation is enforceable only if made by counsel in open court."); Pretzel Time, Inc. v. Pretzel Int'l, Inc., No. 98 Civ.

10

1544 (RWS), 2000 WL 1510077, at *3 (S.D.N.Y. Oct. 10, 2000) ("An oral contract may be binding even if the parties plan to create a documentary record of the agreement.").

The Second Circuit has identified four factors to be considered in determining whether parties intended to be bound in the absence of a signed written agreement:

(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing. No single factor is decisive, but each provides significant guidance.

Powell, 497 F.3d at 129 (citing Winston, 777 F.2d at 80 and Ciaramella, 131 F.3d at 323) (internal quotation marks omitted).

1. Express Reservation

There was no express reservation of the right not to be bound until a written agreement was signed. After meeting with the parties for several hours, the parties convened in the courtroom, where the Court stated that they had "reached an agreement . . . on terms to settle the case with the understanding that the agreement will be subsequently embodied in a writing that will be circulated and signed." (Tr. at 3.) Plaintiff's counsel then outlined the terms of the agreement on-the-record. The Court next asked Plaintiff, who is an attorney, if he had a chance to discuss the terms of the agreement with his attorney, to which he responded that he had. The Court then asked Plaintiff whether he understood

11

the terms of the agreement, to which he responded that he did. (See id. at 8-9.) Finally, the Court asked if Plaintiff was prepared to settle the case on the terms set forth by his attorney, to which he responded that he was. The Court concluded by stating, "Great. I'm really glad that we can finally get some closure here. . . .I'm glad we were able to resolve it. Mr. Aguiar, good luck in the future. I hope things go well for you." (Id. at 9-10.) Neither party expressed any reservation.

Contrary to Plaintiff's position, simply because the parties contemplated that the agreement would be reduced to writing does not indicate that they had agreed, either explicitly or implicitly, not to be bound until a written agreement was signed. Cf. Powell, 497 F.3d at 130 ("[Defendant's] attorney stated without objection that the 'parties have agreed that the formal settlement documents will incorporate the following terms and conditions,' suggesting that the settlement's reduction to writing was only a formality."); Winston, 777 F.2d at 80 ("This freedom to contract orally remains even if the parties contemplate a writing to evidence their agreement. In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to execution."); Lopez v. City of New York, 242 F. Supp. 2d 392, 393 (S.D.N.Y. 2003) ("It is clear that neither party expressed a reservation on the record of a right not to be bound in the absence of an executed agreement . . . . Even if the parties agreed to the

12

settlement in open court with the intent to draft and sign a written settlement agreement and general release, this does not satisfy the express reservation requirement.").

The case of Lindner v. American Express Corp., No. 06 Civ. 3834 (JGK), 2007 WL 1623119 (S.D.N.Y. June 5, 2007), which Plaintiff heavily relies upon, is clearly distinguishable. In Lindner, when the agreed upon terms were being placed on the record, on two occasions Plaintiff's counsel stated on the record that he reserved the right to modify the language of any written agreement. See id. at *2, 4. Moreover, the parties incorporated by reference an earlier agreement, that contained a revocation clause permitting the plaintiff to revoke the agreement within seven days. As the court noted, "[p]arties to an enforceable agreement would clearly not include such a clause in a proposed settlement." Id. at *7 (quoting Cruz v. Onesource Facility Serv., Inc., No. 03 Civ. 8233 (LAP), 2005 WL 2923517, at *2 (S.D.N.Y. Nov. 4, 2005)). Finally, the parties in Lindner did not conclusively set forth all of the agreement's terms. For example, the court noted that there were some details that needed to be finalized, which required getting information from persons not present. In addition, the parties stated that the agreement would contain "all of the standard terms and conditions" of a prior agreement, but they did not list those terms, and subsequently disagreed about them. See id. at *2, 5.

13

In the instant case, there was no confusion or ambiguity expressed about the terms of the agreement; there was no reservation of rights with respect to altering the language of the agreement; and there was no provision permitting Plaintiff to revoke the agreement. While Defendants did agree to draft one or two side-letters stating (1) that the court-Defendants would take into account seniority in any operational decision-making regarding Mr. Aguiar's employment, and (2) that Plaintiff was considered a satisfactory employee at that time, and that there was no present intention to transfer, terminate, or otherwise discipline him, the terms of those side-letters were discrete and stated clearly on the record. Similarly, the parties had negotiated and agreed upon the terms of the judicial liaison alternative dispute resolution mechanism, set forth in a separate document. (See Beranbaum Aff., Ex. 5.) The Court rejects Plaintiff's contention that the agreement "failed to define the liaison procedure with any exactness, . . . . [and that] [t]he parties clearly anticipated that they would need to spell out with particularity their plan to use the services of an Appellate Division Justice . . . ." (Pl.'s Mem., at 16.) The side-agreement is clear and as precise as necessary.

The Court therefore concludes that the first Winston factor supports enforcing the oral settlement agreement.

2. Partial Performance

Plaintiff contends that there was no partial performance by either Plaintiff or Defendants. He argues that, under the agreement, he was obligated to return various personnel records produced in discovery, and was entitled to an introductory meeting with Justice Mazzarelli. Neither of those things occurred.

While Defendants concede that they took no affirmative action to comply with the terms of the agreement, there were few concrete actions that were required. Although Defendants committed to implementing an employee evaluation program, that was not scheduled to occur until February 2009. Instead, Defendants argue that they committed to refrain from doing various things, such as retaliating against Plaintiff and altering Plaintiff's workplace, and they agreed to give advance notice to Plaintiff of any adverse action. They argue that they were performing all of those obligations. Moreover, they did draft the two side-letters required by the agreement; the parties simply disagreed about the wording of the side-letters.

In fact, both parties partially performed a critical part of the oral agreement. As part of their agreement, the parties agreed that they would consent to proceed before this Court for all purposes, pursuant to 28 U.S.C. § 636(c), so that this Court would enter the consent judgment and, for a period of two years, be the exclusive forum for enforcement of the agreement and any legal action by Plaintiff regarding any alleged future retaliation.

15

Within days of placing their oral agreement on the record, Plaintiff and Defendants did execute the consent form; they then submitted it to Judge Rakoff, the district judge to whom the case had been assigned, and Judge Rakoff signed the consent form and referred the action to this Court for all purposes. (See Consent to Proceed Before United States Magistrate Judge, Docket Entry # 29.) If there was no binding agreement, and if the execution of the written documents was intended to be more than a formality, the parties would not have agreed to proceed before this Court for all purposes prior to finalizing and executing the settlement documents.

The Court therefore concludes that this factor weighs in favor of Defendants' position that the oral agreement was intended to be binding.

### 3. Agreement on All Terms

The third factor to be considered is whether all of the material terms had been agreed to, or whether there were matters left to negotiate. See Powell, 497 F.3d at 130; Ciaramella, 131 F.3d at 325; Winston, 777 F.2d at 82. Just because parties subsequently attempt to add terms to a written document, or disagree over language in drafting a written agreement, does not mean that their oral agreement is not enforceable, particularly where the oral agreement is clear and unambiguous. As the Medinol court observed:

16

It almost goes without saying that an oral statement of a settlement is not fully integrated and complete. It is, by definition, an outline of terms that the parties later intend to flesh out and reduce to writing. A trial court's inherent power to enforce summarily a settlement agreement where the terms of the agreement are clear and unambiguous . . . is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings. A settling party — no matter how acute its buyer's remorse — may not assert ambiguity to undo the settlement when the record contains an agreement that is clear on its face.

Medinol, 500 F. Supp. 2d at 353; see also Lindner, 2007 WL 1623119, at *6 n.3 ("Of course if the Court found that there was a binding oral agreement, the next step would be to determine what the terms of that agreement were. At that second step, the liquidated damages provision [inserted in a draft by defendant], if not part of such an agreement, would be excised.").

Plaintiff argues that the oral agreement contained, "in large part, . . . generic, non-specific terms, such as 'advance notice'; 'non-admissions clause'; [and] a 'no-retaliation clause,'" and he points to the draft agreement he received from Defendants, arguing that "in their draft agreement, [Defendants] interpreted these open-ended terms in a self-serving way that granted themselves rights not articulated in the oral agreement." (Pl.'s Mem., at 7 (internal citations omitted).) On the other hand, Defendants argue that they are prepared to honor the commitments they made in the oral agreement, and it is Plaintiff who attempted "to add new or modified terms that had never been agreed upon by the parties which had the effect of 're-writing' the agreement in a significant

17

fashion." (Reply Memorandum in Further Support of Motion to Enforce Settlement Agreement ("Defs.' Reply Mem."), at 5.)

It is of little consequence what the parties attempted to do after-the-fact in drafting a written agreement, since the agreement placed on the record was clear and did not leave any material matters to be negotiated.[2] When the oral settlement agreement was placed on the record, both parties had an opportunity to be heard and to clarify or correct any term of their agreement. Again, neither party expressed any reservations or confusion, or conditioned his agreement on approval of the language in a written document. Cf. Lopez, 242 F. Supp. 2d at 394 ("Although the parties are disputing the addition of certain terms to the settlement, at no time before this Court did either party raise these issues. Therefore, this factor [whether all of the terms of the alleged agreement have been agreed upon] favors settlement.").

For example, there is no dispute that Defendants agreed to

---

[2] This case is distinguishable from the situations in Ciaramella and Winston, where there was no on-the-record in-court settlement agreement. There, among themselves, the parties reached an agreement to settle the case and then set about drafting a written document that embodied their agreement. Before it was signed, the plaintiff decided to back out of the deal. The issue before the court was how to discern whether the parties intended to be bound in the absence of a signed writing. By necessity, the court looked to the words the parties used in drafting the agreement, and their back and forth negotiations, to ascertain when they intended it to become effective. By contrast, here the parties' on-the-record agreement was clear and unambiguous, there were no further negotiations contemplated or held, and there is no draft agreement that was prepared by both parties.

18

provide notice to Plaintiff of any planned adverse employment
action, except in the event of gross misconduct. In their draft,
Defendants provided that "[w]here possible, the Court Defendants
shall endeavor to provide Plaintiff with advance notice of proposed
materially adverse employment actions . . . ." (Defs.' Draft
Agreement, at 7.) However, the oral agreement did not allow for
Defendants' obligation to be conditional. Plaintiff, in turn,
wrote into the agreement a provision requiring at least 60 days'
notice of any intended adverse employment action. In their oral
agreement, the parties only agreed upon advance notice. Neither
party's draft is consistent with the clear terms of the oral
agreement, and that they both tried to modify the agreement, ex
post facto, does not render it ambiguous or unclear. Cf. Medinol,
500 F. Supp. 2d at 351 ("The fact that a settlement has not yet
been reduced to a writing that includes every detail of the
agreement should not be a 'green light' to permit a party to
'inject new, deal-altering restrictions' which were 'not disclosed
to the Court.'"). Moreover, contrary to Plaintiff's contention,
the absence of a specific time-period for advance notice did not
render the agreement unenforceable. "[N]ot all terms of a contract
need be fixed with absolute certainty." Tractebel Energy Mktg.,
Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d Cir. 2007)
(quoting Express Indus. & Terminal Corp. v. N.Y. State Dep't of
Transp., 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857 (1999)). The duty of

good faith and fair dealing is implied in every contract, and it "embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Id. at 98. Because the agreement provides a dispute resolution mechanism through the good services of Justice Mazzarelli, there must be sufficient advance notice to permit Plaintiff to make use of that mechanism.

Other so-called "generic" terms cited by Plaintiff, such as a "non-admissions clause" and a "no-retaliation clause," and "waiver and release," are standard provisions in settlement agreements, as to which neither party expressed any reservation, doubt, or confusion, and simply because the parties did not set forth the language of those provisions verbatim does not signify that they had not agreed to be bound until a writing containing the wording of those provisions was agreed to and signed. Cf. Pretzel Time, 2000 WL 1510077, at *3 ("The fact that plaintiff's counsel added boilerplate language to . . . the oral agreement does not undermine the evidence that the settlement defendants intended to be bound by the oral agreement.").

Plaintiff also argues that there were unclear or contradictory provisions which remained to be resolved. For example, Plaintiff contends that there were conflicting provisions about whether Plaintiff retained his statutory and collective bargaining remedies for challenging unlawful retaliation in the future. On the one

20

hand, Plaintiff was given the right to use an alternative dispute resolution mechanism, where Justice Mazzarelli would act as a liaison between the parties in the event of alleged retaliation. The terms of that mechanism were spelled out in a separate agreement that the parties had negotiated, and which was incorporated by reference into the oral agreement. (See Beranbaum Aff., Ex. 5.) The side-agreement provides that if Plaintiff is dissatisfied with the resolution of the matter before Justice Mazzarelli, he may "utilize whatever other remedies may be available to him pursuant to law, rule, statute, or collective bargaining agreement." (Id. ¶ 4.)

Plaintiff contends that this provision is at odds with another provision of the oral agreement, in which it was agreed that the consent decree would be the exclusive forum for any legal action by Plaintiff regarding any allegation of unlawful retaliation. According to Plaintiff, because of this alleged ambiguity, Plaintiff did not knowingly waive his Title VII rights and there was a need for further clarification. The Court disagrees.

Rather than reflecting terms that had not been agreed upon, the alleged ambiguity merely requires the normal process of contract construction to discern its meaning. Cf. Pretzel Time, 2000 WL 1510077, at * 4 ("[H]ow to interpret the terms of the contract as recorded is a different question than whether or not the parties agreed to them."). For example, it was agreed that the

21

alternative dispute resolution mechanism, using the services of Justice Mazzarelli, is to remain in effect for a period of three years, while the consent judgment is to remain in effect for two years. Therefore, for the one-year-period following the expiration of the consent decree, if Plaintiff is dissatisfied with the outcome of the informal dispute resolution procedure, he retains his right to seek relief through any means authorized by law, statute, or his collective bargaining agreement. If, however, during the term of the consent decree, he is dissatisfied with the dispute resolution process and wishes to bring a legal action regarding alleged unlawful retaliation, he is limited to seeking relief in this Court in an enforcement proceeding. Moreover, even while the consent decree remains in effect, the agreement does not preclude Plaintiff from seeking to enforce rights he has under his collective bargaining agreement. It is only if Plaintiff chooses to bring a legal action regarding alleged unlawful retaliation, that he is limited to bringing an enforcement action in this Court.

Similarly, the parties' agreement regarding the confidentiality of discovery materials was not left unresolved. The parties agreed that the deposition transcript of one employee (Susanna Rojas) would be kept confidential, and that "all discovery documents exchanged between the parties will remain confidential." (Tr. at 4.) They further agreed that the personnel files of employees other than Plaintiff, that had been produced in

22

discovery, would be returned to Defendants. Although Plaintiff questions whether the parties agreed to maintain as confidential the discovery materials that had not previously been designated as confidential, resolution of that question requires contract construction; it does not signify a failure to agree.

The Court therefore concludes that, while there are generic provisions that were agreed to, most settlement agreements contain standard boilerplate language addressing those issues, and there was no suggestion by any party that he was not agreeing to be bound until the boilerplate language was agreed upon. Moreover, if there is any ambiguity in the terms of the agreement, it does not reflect a failure to agree or an agreement to negotiate further.

This factor, therefore, supports the conclusion that the parties viewed their on-the-record oral agreement as being binding.

4. Type of Agreement that is Usually Reduced to Writing

The last factor to be considered — whether the parties' agreement is of such a nature that it would usually be reduced to writing — is a closer one.

"Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." Ciaramella, 131 F.3d at 326. "The significance of announcing the terms of an agreement on the record in open court is to ensure that there are at least some formal entries . . . to memorialize the critical litigation events, and to perform a cautionary function

23

whereby the parties' acceptance is considered and deliberate."
Powell, 497 F.3d at 131 (internal quotation marks and citations
omitted).

In the instant case, after approximately four hours of
negotiations, with the Court's assistance, the parties agreed to
place the terms of their agreement on the record, in open court.
The parties gathered in the courtroom, where each provision of the
agreement was set forth and transcribed; and, the most complex
provision of the agreement — the liaison dispute resolution
provision — had actually been outlined in writing, and was
incorporated by reference. The in-court, on-the-record oral
settlement agreement thus "functioned in a manner akin to that of
a memorializing writing." Id.; see also Lopez, 242 F. Supp. 2d at
394 ("[A]though this is the type of contract normally reduced to
writing, the agreement on the record in open court counts as a
writing, and thus this factor favors finding a settlement.").[3]

---

[3] Under New York law, an oral settlement agreement is
enforceable only if it is made between counsel in open court. See
N.Y. C.P.L.R. § 2104 (McKinney 1997). There can be little doubt
that the settlement agreement in this action satisfied the
requirements of New York law, where both counsel and the parties
were present in court and indicated the consent to the negotiated
terms. See Silas, 536 F. Supp. 2d at 359-60 (agreement made on
the telephone by plaintiff and in the robing room by defendants'
counsel was not made in open court; "[A]n oral agreement reached
before a judge in an informal setting and without adequate
contemporaneous documentation of the fact and terms of the
agreement is not ordinarily enforceable."); Alvarez v. City of
New York, 146 F. Supp. 2d 327, 337-39 (S.D.N.Y. 2001)
(requirements of C.P.L.R. § 2104 were satisfied where there were
extensive settlement conferences with the court, plaintiff's

24

Contrary to Plaintiff's contention, the settlement agreement was not complex. With the exception of the liaison procedure (that had been spelled out in writing), and the agreement to provide notice to Plaintiff of proposed adverse employment actions, the agreement does not require any affirmative action by Defendants, other than what is required by law (non-retaliation). Most of the provisions of the agreement are standard boilerplate items contained in virtually all settlement agreements, such as neither party being deemed a prevailing party, no admission of liability, and mutual general releases.[4]

In sum, the agreement in issue is not the complex type of settlement that typically would need to be reduced to writing, and, in any event, placement of the settlement agreement on the record, in open court, is closely akin to a writing. Cf. Medinol, 500 F. Supp. 2d at 353 ("A settlement stated on the record is one of the strongest and most binding agreements in the field of law and is thus entitled to substantial deference.") (quotation and citation

___

counsel reported his acceptance of settlement offer directly to the court over the telephone, and agreement was memorialized on the record at a subsequent conference).

[4] Although the agreement called for the execution of two side-letters, the terms of those letters were set forth on the record, and were relatively straightforward. As discussed, one letter was to confirm that Plaintiff was considered, at the time, to be a satisfactory employee, and that Defendants had no present intention to transfer, terminate, or otherwise discipline him. Either the same or another letter was to indicate simply that Defendants would take into account seniority in any future operational decision-making regarding Plaintiff's employment.

omitted).

There is one aspect of the agreement, however, which gives the Court some pause. The parties agreed to the entry of a consent decree that would be signed by the Court. Plaintiff argues that this agreement suggests that the written documents that were to be executed were not a mere formality.

The Court disagrees. The parties' agreement to the entry of a consent decree was clear and explicit. The execution of a consent decree is merely a means of providing for the Court's continuing jurisdiction to enforce the settlement agreement. It does not require, and the parties did not contemplate, any further negotiation over the substantive terms of the judgment. The only difference between a consent decree and any other written stipulation of settlement that may follow a binding oral agreement, is that it is endorsed by the court. See BLACK'S LAW DICTIONARY (8TH ED.) ("**agreed judgment**. A settlement that becomes a court judgment when the judge sanctions it. In effect, an agreed judgment is merely a contract acknowledged in open court and ordered to be recorded, but it binds the parties as full as other judgments. — Also termed consent judgment; stipulated judgment; judgment by consent.").

Nevertheless, the caselaw recognizes a more technical definition of a "true" consent decree, as distinguished from a settlement judgment. The distinction was addressed by the Second

Circuit in <u>Janus Films, Inc. v. Miller</u>, 801 F.2d 578 (2d Cir.

1986).

> Where a settled lawsuit results in a judgment, the court
> enters either a consent judgment or what might be called
> a "settlement judgment." With a true "consent judgment"
> all of the relief to be provided by the judgment and all
> of the wording to effectuate that relief is agreed to by
> the parties. The court makes no determination of the
> merits of the controversy or of the relief to be awarded.
> With a "settlement judgment the parties have agreed on
> the components of a judgment, including the basic aspects
> of relief, but have not agreed on all the details or the
> wording of the judgment. The components of the agreement
> are usually reported to the court on the record. As with
> a consent judgment, the judge makes no determination of
> the merits of the controversy. With respect to relief,
> however, the judge's role in a settlement judgement is
> slightly broader. Since the parties have agreed only
> upon the basic aspects of relief, the judge is obliged to
> determine the detailed terms of the relief and the
> wording of the judgment. In determining the details of
> relief, the judge may not award whatever relief would
> have been appropriate after an adjudication on the
> merits, but only those precise forms of relief that are
> either agreed to by the parties, or fairly implied by
> their agreement . . . . In determining the wording of a
> settlement judgment, the judge proceeds, as with an
> adjudicated judgment, to draft language, adopt the
> proposal of the party that effectively "won," or adopt
> portions of draft language proposed by any of the
> parties.

<u>Id.</u> at 582.

Here, the parties did not make clear what they meant by the

entry of a consent decree. Specifically, there was no discussion

of whether they were simply agreeing that there would be a court

judgment embodying the terms of their agreement, with the parties

taking the first stab at drafting the proposed decree, or whether

they expected that the parties were required to first agree on the

27

specific wording of a consent decree that would then be submitted to the Court for entry. In the Court's view, it was not the latter, since there is nothing that suggests that the parties were thinking of the technical definition of a consent decree, and there was no discussion of the need for the parties to agree on written terms; indeed, neither party has even made that argument to the Court in its submissions.[5] Moreover, each party's proposed written draft agreement is simply a stipulation of settlement setting forth the terms of the agreement, with a signature line at the end for the Court to "so order" the agreement. The Court's sanctioning of the parties' agreement is not necessary to make it binding. It is merely a means of creating continuing enforcement jurisdiction.

In the end, whether it is by entry of a settlement or consent judgment, "[a] court's authority to enforce a settlement by entry of a judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings." Janus Films, 801 F.2d at 583. Thus, even where parties agree to the entry of a consent judgment, a court is not foreclosed from acting on a settlement when the parties cannot agree on the wording of the decree. See, e.g., Core-Vent Corp. v. Implant Innovations, Inc., 53 F.3d 1252 (Fed. Cir. 1995) (where parties agreed to terms of a

---

[5] Plaintiff merely argues that the fact that there was to be a consent judgment demonstrates that the need for a written document was not a mere formality.

28

settlement on the record, agreed to the entry of a consent judgment, and were directed to reduce the agreement to a judgment for the court's signature, but later disagreed about the terms of the judgment, appellate court concludes that the district court properly entered its own judgment, which was consistent with the terms of the oral agreement). As the Second Circuit observed in Janus Films:

> Even if the settlement agreement does not include a completely drafted consent judgment, a court is not obliged to place a trial on hold, to be resumed if the parties fail to agree on the precise wording of a judgment. Due regard for the proper use of judicial resources requires that a trial judge proceed with entry of a settlement judgment, after affording the parties an opportunity to be heard as to the precise content and wording of the judgment . . . .

801 F.2d at 583.

Of course, judgments are normally written documents. Balancing the fact that the parties reached an on-the-record in-court settlement agreement, which is akin to a written settlement agreement, against the fact that the parties' agreement was to be embodied in a consent judgment, usually a written document, the Court concludes that this fourth factor is either neutral or tips slightly in favor of finding the in-court agreement binding.

## CONCLUSION

The Court therefore concludes that the first, second, and third Winston factors weigh in favor of finding a binding oral settlement agreement, while the fourth factor is either neutral or

29

tips in favor of finding a binding oral agreement. Considering the totality of the circumstances — including the fact that Plaintiff himself is an attorney, who was present and active throughout the negotiations and indicated his assent on-the-record to the terms of the settlement, with no reservations or conditions attached — the Court concludes that the parties' oral settlement agreement was intended to be a binding agreement. Accordingly, Defendants' motion to enforce the settlement agreement is granted. The parties shall promptly confer and, within fourteen days of this Opinion and Order, shall submit a proposed consent decree for entry by the Court, that incorporates the terms of their in-court settlement agreement. If there are any disagreements about the wording of the agreement, each party should set forth his position in a letter not exceeding five pages in length, and after due consideration, the Court will enter a settlement judgment that is consistent with the terms of the oral agreement.

So ordered.

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: September 25, 2008
       New York, New York

30